United States District Court
Southern District of Texas

**ENTERED**

February 28, 2019

David J. Bradley, Clerk

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

BRIAN D. KEARNES,                    §
                                     §
        Plaintiff,                   §
                                     §
v.                                   §    CIVIL ACTION NO. H-17-2251
                                     §
NANCY A. BERRYHILL,                  §
ACTING COMMISSIONER OF THE           §
SOCIAL SECURITY ADMINISTRATION,      §
                                     §
        Defendant.                   §

## MEMORANDUM AND RECOMMENDATION

Pending before the court[1] are Plaintiff's Motion for Summary Judgment (Doc. 14) and Defendant's Cross-Motion for Summary Judgment (Doc. 15). The court has considered the motions, the responses, the administrative record, and the applicable law. For the reasons set forth below, the court **RECOMMENDS** that Plaintiff's motion be **GRANTED**, that Defendant's motion be **DENIED**, and this matter be **REMANDED** for further consideration in light of the court's memorandum.

## I.  Case Background

Plaintiff filed this action pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3) for judicial review of an unfavorable decision by the Social Security Administration ("SSA") Commissioner ("Commissioner" or "Defendant") regarding Plaintiff's claim for

---

[1]     This case was referred to the undersigned magistrate judge pursuant to 28 U.S.C. § 636(b)(1)(A) and (B), the Cost and Delay Reduction Plan under the Civil Justice Reform Act, and Federal Rule of Civil Procedure 72.  See Doc. 2, Ord. Dated July 27, 2017.

disability insurance benefits and supplement security income under Titles II and XVI of the Social Security Act ("the Act").

Plaintiff was born on June 30, 1967, and was forty-six years old on the alleged disability onset date of August 19, 2013.[2] Plaintiff, who graduated from high school, worked as an operation tabulator for a fabric/craft company, a medical equipment consultant at a medical supply company, an operation supervisor at a pharmacy, and a home healthcare specialist.[3]

## A.  **Medical History**

The medical records generally support Plaintiff's treatment for endocarditis resulting in an aortic valve replacement, cervical spine degenerative disease, status post cervical fusion, and obesity.

On August 19, 2013, Plaintiff sought treatment for weakness, fever, chills, fatigue and chest pain at St. Luke's Hospital.[4]  He was diagnosed with endocarditis and critical aortic stenosis, and, on August 22, 2013, underwent an aortic valve replacement and two weeks of intravenous antibiotic therapy.[5] His weight was recorded as 257.4 pounds.[6]

---

[2]    See Tr. of the Admin. Proceedings ("Tr.") 288.

[3]    See Tr. 81, 94-96, 318-19.

[4]    See Tr. 432.

[5]    See Tr. 432, 434.

[6]    See Tr. 433.

A chest x-ray on August 28, 2013, showed a normal-sized heart shadow, sternotomy wires, and a peripherally inserted central catheter ("PICC") line in the superior vena cava area.[7]

On September 17, 2013, Plaintiff returned for a post-procedure follow-up visit.[8]  Charles R. Sims, M.D. ("Dr. Sims"), noted that Plaintiff "overall feels much better since last week.[9]  All fever, sweats, rash had resolved."[10]  One month later, on October 11, 2013, Plaintiff reported that he had been feeling well except for a chest cold presenting with a cough and congestion.[11]  He was found to have a normal heart rate, normal motor strength in the upper and lower extremities, and a normal spine.[12]  An echocardiogram taken several days earlier showed a normal left ventricular cavity, some pseudo normal left ventricular diastolic dysfunction, and a normal left ventricular ejection fraction.[13]   He was cleared for cardiac rehabilitation.[14]

On December 30, 2013, Plaintiff sought medical treatment for chest and abdominal pain, belching, bloating, vomiting, and

---

[7]    See Tr. 1029.

[8]    See Tr. 419.

[9]    See id.

[10]   See id.

[11]   See Tr. 417.

[12]   See Tr. 417-18.

[13]   See Tr. 570.

[14]   See Tr. 417.

constipation from Serge-Alalu Awasunu, M.D. ("Dr. Awasunu").[15]  Dr. Awasunu recorded that Plaintiff had a normal heart function and his weight was 274.8 pounds.[16]   A colonoscopy and endoscopy were performed on January 30, 2014.[17]   The examination showed multiple dispersed large non-bleeding erosions in the gastric antrum.[18] Diverticula were observed in the colon, and a small polyp was removed.[19]  It was determined that Plaintiff suffered from gastro-esophageal reflux disease and he was prescribed medication.[20]   At a follow up visit on February 4, 2014, Plaintiff reported some improvement in his abdominal pain.[21]

On March 13, 2014, Plaintiff saw cardiologist Chacko Alexander, M.D. ("Dr. Alexander"), complaining of "popping and clicking" sounds coming from his aortic valve replacement.[22] Plaintiff explained that his primary care physician wanted to release him to work, but Plaintiff did not believe he was ready to resume work because he was suffering from shoulder pain, constipation from pain medication, stomach irritation, and elevated

---

[15]   See Tr. 597.

[16]   See id.

[17]   See Tr. 562, 566.

[18]   See Tr. 562.

[19]   See Tr. 566.

[20]   See id.

[21]   See 559.

[22]   See Tr. 698.

4

blood pressure.[23]  Upon examination, Dr. Alexander found a regular heart rhythm, normal heart sounds, and no clicking.[24]  The physician heard a systolic murmur in the upper sternal border.[25]  He concluded that Plaintiff suffered from malignant hypertensive heart disease without heart failure.[26]  Plaintiff's cervical spine was found to be unremarkable.[27]  Plaintiff was advised to continue his present medications and to keep a daily log of his blood pressure.[28]  Dr. Alexander also ordered a computerized topography ("CT") image of Plaintiff's sternum.[29]

On May 2, 2014, Plaintiff underwent a CT scan of his sternum.[30] An examination prior to the procedure noted no neck pain or stiffness, no abdominal pain, no arthralgias or mayalgias, and normal ranges of movement in his extremities.[31]  Plaintiff's blood pressure was elevated and he complained of chest pain.[32] Plaintiff's

---

[23]    See id.

[24]    See id.

[25]    See id.

[26]    See id.

[27]    See Tr. 699.

[28]    See id.

[29]    See id.

[30]    See Tr. 841.

[31]    See Tr. 839.

[32]    See id.

weight was found to be 284 pounds.[33]

The CT scan and x-ray showed a sternal nonunion.[34]   Plaintiff underwent a rigid sternal fixation on May 14, 2014.[35]   On May 24, 2014, Plaintiff presented at the emergency room complaining of chest pain.[36]  He underwent another CT scan, which showed a possible pulmonary thrombosis.[37]  He was prescribed anti-coagulants.[38]  On May 26, 2014, Plaintiff reported less chest pain, and it was noted that he was "in no apparent distress."[39]  Plaintiff was discharged from the hospital on June 1, 2014; his weight was 281 pounds.[40]

On November 18, 2014, Plaintiff returned to heart surgeon Mark Mettauer, M.D. ("Dr. Mettauer"), for a postoperative visit related to his sternum repair six months earlier.[41]  Dr. Mettauer found that the sternum was stable and Plaintiff's heart auscultation was normal with no murmurs, but the skin over his left chest area was hypersensitive.[42]   Plaintiff was prescribed a medication for

---

[33]   See Tr. 839.

[34]   See Tr. 845.

[35]   See Tr. 846-47.

[36]   See Tr. 926.

[37]   See Tr. 926-29.

[38]   See Tr. 929.

[39]   See Tr. 931.

[40]   See Tr. 937-38.

[41]   See Tr. 997.

[42]   See Tr. 998.

neuropathic post-operative pain.[43]

On February 23, 2015, Plaintiff sought treatment from Thomas Synek, M.D. (Dr. Synek), complaining of chest pain.[44]  Dr. Synek noted that Plaintiff's medications were helping him and determined that injections were unnecessary at that time.[45]

On March 31, 2015, Plaintiff sought treatment from Albert John Fenoy, Jr., M.D. ("Dr. Fenoy"), for neck pain and arm weakness, reporting that the neck pain began after the aortic valve surgery.[46] Plaintiff rated his pain as ranging from two to ten on a scale of ten.[47]  He reported that he declined an offer of a topical pain cream from his primary care physician.[48]

Upon examination, Dr. Fenoy found that Plaintiff had full strength and sensation in both arms and legs.[49]  A magnetic resonance imaging ("MRI") showed congenital narrowing of the cervical spine from D3-C6, mild disc protrusions at C2-C3, C4-C5. C5-6 and C6-7 and a moderate dorsal bulge at C3-C4.[50]  Dr. Fenoy concluded that Plaintiff had multilevel degenerative disease

---

[43]     See id.

[44]     See Tr. 1275.

[45]     See id.

[46]     See Tr. 1225.

[47]     See id.

[48]     See id.

[49]     See Tr. 1226-27.

[50]     See Tr. 1227.

superimposed on congenital spinal canal stenosis, moderate to severe left spinal canal stenosis with a left ventral spinal cord deformity at C3-C4, moderate to severe left foraminal stenosis at C3-C4, moderate right spinal canal stenosis with right ventral spinal cord contouring at C6-C7, and moderate to severe bilateral frontal stenosis and right lateral stenosis at C6-C7.[51]  Dr. Fenoy referred Plaintiff to physical therapy with instructions to return to the clinic to develop a plan of care.[52]  At the time of the visit, Plaintiff weighed 278 pounds.[53]

On April 6, 2015, Plaintiff returned to Dr. Synek, complaining of chest pain.[54]  Plaintiff was reporting a decrease in neck and chest pain due to visits with other doctors and massage therapy.[55]  Dr. Synek noted that while a cervical MRI showed significant degeneration, Plaintiff was relatively symptom free except for headaches and coordination issues.[56]  Plaintiff demonstrated 5/5 strength in all upper extremity muscles and had no atrophy.[57]  Dr. Synek referred Plaintiff to neurosurgery.[58]

---

[51]    See id.

[52]    See Tr. 1228.

[53]    See Tr. 1226.

[54]    See Tr. 1275.

[55]    See id.

[56]    See id.

[57]    See Tr. 1277.

[58]    See Tr. 1275.

On April 29, 2015, Plaintiff returned to Dr. Fenoy, complaining of neck pain, dizziness, and headaches.[59]   Plaintiff reported improvement in right arm pain and dropping objects.[60] Plaintiff was instructed to continue with an additional four weeks of physical therapy, after which surgical options would be discussed.[61]

On July 14, 2015, Plaintiff returned for a follow-up visit with a physician's assistant.[62]   Plaintiff reported that he had attended physical therapy sessions biweekly for two weeks and continued the exercises at home.[63]   His pain had reduced to a three to six on a scale of ten but after carrying a case of water, he experienced a pop in his chest and his neck pain increase to a six to ten on a ten-point scale.[64]  A physical exam returned normal findings with the exceptions of stiffness and decreased range of motion in the neck.[65]   Plaintiff was told to return to physical therapy and discuss with his primary care physician whether steroid injections were an appropriate course of action.[66]

---

[59]      See Tr. 1232.

[60]      See id.

[61]      See id.

[62]      See Tr. 1248.

[63]      See id.

[64]      See id.

[65]      See Tr. 1250.

[66]      See Tr. 1251.

On August 3, 2015, Plaintiff underwent a cervical steroid injection, and on December 5, 2015, underwent a T3-T7 intercostal nerve block.[67]  On December 9, 2015, Plaintiff returned to Dr. Fenoy complaining of right side chest pain, worsening dizziness, occasional right arm pain, and dropping objects daily.[68]  Dr. Fenoy discussed the risks and benefits of an anterior cervical diskectomy and fusion with Plaintiff.[69]   Plaintiff elected to have the surgery.[70]

On December 14, 2015, Plaintiff underwent a cervical epidural steroid injection.[71]   According to the decision of the ALJ, Plaintiff underwent a cervical spinal fusion in March 2016.[72]  The record before the ALJ did not include those records, but Plaintiff submitted other medical records in his appeal to the Appeals Council.  Those records are summarized below.

On January 18, 2016, Plaintiff sought treatment for exertional chest pain and shortness of breath from Pratep Agusala, M.D. ("Dr. Agusala").[73]  Plaintiff explained that he had an aortic valve replacement in 2013, and his present chest pain and shortness of

---

[67]   See Tr. 1257, 1264.

[68]   See id.

[69]   See Tr. 1258.

[70]   See id.

[71]   See Tr. 1262.

[72]   See Tr. 68.

[73]   See Tr. 21.

breath was similar to that experienced pre-surgery, but less intense.[74] Plaintiff reported that he could walk up to a mile with several breaks.[75] He also complained of dizziness and dyspnea.[76] His weight was 270 pounds.[77]

A physical exam found normal heart rhythm, pulses, and lung sounds; other observations were recorded as normal.[78] Dr. Agusala ordered a cardiac stress test.[79]

On January 25, 2016, Plaintiff submitted to a myocardial perfusion stress test.[80] It was determined that Plaintiff had normal sinus rhythm, no significant dysrhythmias, and normal left ventricular wall motion and segmental function.[81] Reversible ischemia was noted.[82]

Plaintiff underwent a left heart catheterization on January 29, 2016, due to symptoms of dyspnea and chest pains.[83] It was found that Plaintiff's heart vessels were unobstructed with no

---

[74]    See id.

[75]    See id.

[76]    See id.

[77]    See Tr. 23.

[78]    See id.

[79]    See id.

[80]    See Tr. 16.

[81]    See id.

[82]    See id.

[83]    See Tr. 14.

high-grade disease.[84]

On May 2, 2016, Plaintiff returned to his cardiologist for a follow-up visit and complained of continuing chest pain, dizziness, and shortness of breath.  Plaintiff reported that "he still gets some chest pain but much improved after neck surgery."[85]  It was noted that Plaintiff's exercise tolerance had improved with rehabilitation.[86]  Plaintiff's heart rhythm was regular and extremity pulses were normal.[87]  His weight was 272 pounds.[88]  He was advised to continue his medications and continue to lose weight.[89]

On July 11, 2016, Plaintiff returned to Dr. Agusala for a follow-up visit related to chest pain and shortness of breath.[90]  A physical exam found Plaintiff's heart was normal to palpitation with a regular rhythm and normal pulses.[91]

## B.  Application to SSA

On February 21, 2014, Plaintiff protectively applied for disability insurance benefits and supplemental security income benefits claiming an inability to work since August 19, 2013, due

---

[84]    See id.

[85]    See Tr. 8.

[86]    See id.

[87]    See Tr. 10.

[88]    See Tr. 9.

[89]    See Tr. 10.

[90]    See Tr. 17.

[91]    See Tr. 19.

to high blood pressure, defective heart valve, chest pain, abdominal pain, vomiting, constipation, weakness, and a lack of stamina.[92]  He was still employed at the time.[93]

On August 2, 2014, Plaintiff was examined by Hanna J. Abu-Nassar, M.D. ("Dr. Nassar"), in connection with his claim for disability.[94]  Dr. Nassar noted that Plaintiff correlated his complaint of abdominal pain to his marked weight gain in December 2013 and constipation.[95]  Although Plaintiff complained of fatigue and tired easily after mild activity, it was noted that he could walk five blocks at a time, could stand or sit thirty minutes at a time, lift twenty pounds, and could climb half a flight of stairs.[96] He was able to perform light housekeeping, grocery shopping, cooking and laundry but did not exercise.[97]  A physical exam was consistent with his medical history; his blood pressure was 193/121 with normal rhythm and no murmur, and he weighed 287 pounds.[98]  Dr. Nassar concluded that Plaintiff's easy fatigability was secondary to cardiac disease, obesity, and degenerative joint disease of the

---

[92]    See Tr. 325, 344-49.

[93]    See id.

[94]    See Tr. 906.

[95]    See Tr. 907.

[96]    See id.

[97]    See id.

[98]    See Tr. 908.  The physician did note "Question of systolic click." Id.

13

right knee.[99]   There was no evidence of congestive heart failure and the possibility of gastroesophageal reflux disease was noted.[100]

A medical consultative expert reviewed the extant medical records and found Plaintiff's symptoms were partially credible.[101] The expert determined that Plaintiff was capable of lifting or carrying up to ten pounds frequently and twenty pounds occasionally, could sit or stand up to six hours in an eight-hour workday and had no postural, manipulative, visual, or communicative limitations.[102]   On September 8, 2014, the SSA found Plaintiff not disabled at the initial level of review.[103]

On December 4, 2014, Plaintiff's request for reconsideration was denied.[104]   On December 23, 2014, Plaintiff requested a hearing before an ALJ.[105]   On November 16, 2015, the ALJ granted Plaintiff's request for a hearing and set it for February 18, 2016.[106]

## C.   **Hearing**

On February 18, 2016, the ALJ convened the hearing.[107]

---

[99]     See Tr. 909.

[100]    See id.

[101]    See Tr. 105-08.

[102]    See Tr. 107.

[103]    See Tr. 102-119.

[104]    See Tr. 122-141.

[105]    See Tr. 158-59.

[106]    See Tr. 173-96.

[107]    See Tr. 93.

14

Plaintiff testified that he had a high school education and had prior employment as a manager of several pharmacy/medical supply companies and most recently worked as an operations tabulator at a fabric store.[108]  Plaintiff verified that he anticipated having neck surgery scheduled in the near future.[109]

In light of the future surgery, the ALJ postponed the case for two months and advised Plaintiff to supplement the record with documentation from that procedure.[110]

The ALJ hearing reconvened on July 18, 2016.[111]  Plaintiff testified that his high blood pressure was being monitored by his physicians and he had an aortic valve replacement in 2013.[112]  He also stated that he had neck decompression surgery on March 11, 2016, at the C6-C7 level.[113]  The surgeon initially restricted Plaintiff to lifting no more than ten pounds, but, on June 1, 2016, the surgeon lifted the restriction and Plaintiff was permitted to perform any activity that did not cause pain or discomfort.[114]  Plaintiff explained to the ALJ that he was lifting no more than

---

[108]    See Tr. 94-96.

[109]    See Tr. 98.

[110]    See id.

[111]    See Tr. 81.

[112]    See Tr. 82.

[113]    See Tr. 83.

[114]    See id.

fifteen to twenty pounds.[115]

Plaintiff also testified that he still suffered from chest pain, rating it ranging from a three to an eight on a ten-point scale.[116]   Plaintiff testified that his neck pain had largely resolved after the neck surgery.[117]

Ms. Cullenberg, the vocational expert ("VE"), was asked by the ALJ about what semi-skilled or unskilled jobs Plaintiff could perform at the light or sedentary levels.[118]   The ALJ did not add any limitations to the light or sedentary exertional levels when questioning the VE.[119]   The VE responded that at the light, semi-skilled level, Plaintiff could perform the positions of a supply clerk, file clerk, and shipping checker.[120]   At the light, unskilled level, Plaintiff could perform the positions of office helper, non-postal mail clerk, and parking lot cashier.[121]   At the sedentary, semi-skilled level, Plaintiff could perform the positions of an appointment clerk, data order clerk, and freight shipment clerk.[122] If Plaintiff were limited to sedentary unskilled employment, he

---

[115]    See Tr. 84.

[116]    See id.

[117]    See Tr. 86.

[118]    See Tr. 87.

[119]    See Tr. 87-88.

[120]    See Tr. 88.

[121]    See id.

[122]    See id.

could perform the work of a document preparer, charge account clerk, and order clerk.[123]

At the hearing, Plaintiff's attorney asked for a closed period of disability, from August 19, 2013, to June 1, 2016.[124]

## D.  Commissioner's Decision

On September 2, 2016, the ALJ issued an unfavorable decision.[125]  The ALJ found that Plaintiff had not engaged in substantial gainful activity since August 19, 2013, the alleged onset date.[126]  The ALJ recognized the following impairments as severe: (1) degenerative disc disease of the cervical spine post cervical fusion; (2) valvular heart disease post heart valve replacement; (3) hypertension; and (4) obesity.[127]  The ALJ found Plaintiff's high cholesterol, fatty liver, brachial neuritis and depression to be nonsevere as none of those impairments caused more than a minimal limitation on Plaintiff's ability to work.[128]

At the next step, the ALJ found that Plaintiff did not meet the requirements of any Listing described in the listings of the

---

[123]    See id.

[124]    See Tr. 89.

[125]    See Tr. 57-78.

[126]    See Tr. 59.

[127]    See Tr. 60.

[128]    See Tr. 60-61.

regulations[129] (the "Listings"), specifically addressing Listings 1.04 (disorders of the spine), and 4.04 (ischemic heart disease).[130]

The ALJ found that Listing 1.04 was not met because the record did not contain the required evidence of a compromise of a nerve root (including the cauda equina) or the spinal cord with additional findings of: (1) evidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness) accompanied by sensory or reflex loss and, if there was involvement of the lower back, positive straight-leg raising; or (2) spinal arachnoiditis; or (3) lumbar spinal stenosis resulting in pseudoclaudication.[131]

Turning to Listing 4.04, the ALJ found that Plaintiff did not meet that Listing because the record did not show a sign or symptom-limited exercise tolerance test demonstrating at least one of the examples in the Listing at a workload equivalent of five METs or less.[132]   Plaintiff also did not show that he had three separate ischemic episodes, each requiring revascularization or was not amenable to revascularization within a twelve-month period.[133]

---

[129]   20 C.F.R. Pt. 404, Subpt. P, App. 1.

[130]   See Tr. 62-63.

[131]   See Tr. 62.

[132]   See Listing 4.04 (A).

[133]   See Listing 4.04 (B).

There was also no evidence of coronary artery disease shown in a medically acceptable imaging or where it had been concluded that an exercise tolerance test would present a significant risk to the individual.[134]  The ALJ also found that Plaintiff's hypertension did not cause restrictions, which, when combined with limitations from other impairments, rose to Listing 4.00's level of impairment.[135]

The ALJ also considered Plaintiff's obesity in accordance with Social Security Ruling 02-1p and found that the obesity did not cause restrictions that when combined with other limitations, satisfied any Listing.[136]  The ALJ found that the obesity could cause limitations in mobility and incorporated exertional limitations into his residual functional capacity finding.[137]

The ALJ provided a very detailed RFC and explained throughout his discussion of the medical evidence what limitations he included to address each of Plaintiff's impairments, severe or nonsevere. The ALJ's assessment resulted in the following RFC:

> After careful consideration of the entire record, the undersigned finds that [Plaintiff] has the [RFC] to perform light work . . . except [he] could never climb ladders, ropes, or scaffolds or balance but could occasionally climb ramps and stairs, stoop, kneel, crouch, or crawl.  Additionally, [Plaintiff] must avoid

---

[134]   See Listing 4.04 (C).

[135]   See Tr. 62.  While there is no Listing for hypertension, the ALJ referred to Listing 4.00 (H)(1) which would permit the Listing to be met if there was a body system affected that met those Listings.

[136]   See Tr. 63.

[137]   See id.

exposure to vibration.[138]
Relying on the vocational expert's response to a question concerning the jobs Plaintiff was capable of performing at the light and sedentary exertional levels and without the above limitations, the ALJ found Plaintiff unable to perform his past relevant work but able to perform the jobs of cafeteria attendant, office cleaner, document preparer, and a surveillance system monitor.[139]   Therefore, the ALJ found that Plaintiff was not disabled at any time from the alleged onset date to the date of the ALJ's decision.[140]

On November 1, 2016, Plaintiff appealed the ALJ's decision.[141] On May 11, 2017, the Appeals Council denied Plaintiff's request for review, thereby transforming the ALJ's decision into the final decision of the Commissioner.[142]   After receiving the Appeals Council's denial, Plaintiff timely sought judicial review of the decision by this court.

## II.  Standard of Review and Applicable Law

The court's review of a final decision by the Commissioner denying disability benefits is limited to the determination of

---

[138]     See id.

[139]     See Tr. 70-72.

[140]     See Tr. 72.

[141]     See Tr. 285.

[142]     See Tr. 1-3.

whether: 1) the ALJ applied proper legal standards in evaluating the record; and 2) substantial evidence in the record supports the decision.  Waters v. Barnhart, 276 F.3d 716, 718 (5th Cir. 2002).

## A. Legal Standard

In order to obtain disability benefits, a claimant bears the ultimate burden of proving he is disabled within the meaning of the Act.  Wren v. Sullivan, 925 F.2d 123, 125 (5th Cir. 1991).  Under the applicable legal standard, a claimant is disabled if he is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment. . . which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(a); see also Greenspan v. Shalala, 38 F.3d 232, 236 (5th Cir. 1994).  The existence of such a disabling impairment must be demonstrated by "medically acceptable clinical and laboratory diagnostic" findings. 42 U.S.C. § 423(d)(3), (d)(5)(A); Jones v. Heckler, 702 F.2d 616, 620 (5th Cir. 1983).

To determine whether a claimant is capable of performing any "substantial gainful activity," the regulations provide that disability claims should be evaluated according to the following sequential five-step process:

> (1) a claimant who is working, engaging in a substantial gainful activity, will not be found to be disabled no matter what the medical findings are; (2) a claimant will not be found to be disabled unless he has a "severe impairment;" (3) a claimant whose impairment meets or is equivalent to [a Listing] will be considered disabled

without the need to consider vocational factors; (4) a claimant who is capable of performing work that he has done in the past must be found "not disabled;" and (5) if the claimant is unable to perform his previous work as a result of his impairment, then factors such as his age, education, past work experience, and [RFC] must be considered to determine whether he can do other work.

Bowling v. Shalala, 36 F.3d 431, 435 (5th Cir. 1994); see also 20 C.F.R. §§ 404.1520, 416.920.  The analysis stops at any point in the process upon a finding that the claimant is disabled or not disabled.  Greenspan, 38 F.3d at 236.

## B.  Substantial Evidence

The widely accepted definition of "substantial evidence" is "that quantum of relevant evidence that a reasonable mind might accept as adequate to support a conclusion." Carey v. Apfel, 230 F.3d 131, 135 (5th Cir. 2000).  It is "something more than a scintilla but less than a preponderance." Id.  The Commissioner has the responsibility of deciding any conflict in the evidence. Id.  If the findings of fact contained in the Commissioner's decision are supported by substantial record evidence, they are conclusive, and this court must affirm. 42 U.S.C. § 405(g).

Only if no credible evidentiary choices of medical findings exist to support the Commissioner's decision should the court overturn it.  See Johnson v. Bowen, 864 F.2d 340, 343-44 (5th Cir. 1988).  In applying this standard, the court is to review the entire record, but the court may not reweigh the evidence, decide the issues de novo, or substitute the court's judgment for the

22

Commissioner's judgment.  <u>Brown v. Apfel</u>, 192 F.3d 492, 496 (5th Cir. 1999).  In other words, the court is to defer to the decision of the Commissioner as much as is possible without making its review meaningless.  <u>Id.</u>

### III. Analysis

Plaintiff requests judicial review of the Defendant's decision to deny disability benefits.  Plaintiff asserts that Defendant erred when: (1) the Appeals Council failed to consider the new evidence that Plaintiff submitted; and (2) the ALJ determined that Plaintiff could perform full-time work throughout the relevant time period.[143]  Defendant argues that the ALJ's decision is legally sound and is supported by substantial evidence.

The court finds it unnecessary to consider the parties' arguments because it is apparent that the ALJ's decision is not supported by substantial evidence.  In his decision, the ALJ found "that [Plaintiff] has the [RFC] to perform light work . . . except [he] could never climb ladders, ropes, or scaffolds or balance but could occasionally climb ramps and stairs, stoop, kneel, crouch, or crawl.  Additionally, [Plaintiff] must avoid exposure to vibration."[144]  However, when questioning the VE, the ALJ did not include any of the limitations that were included in the ALJ's RFC

---

[143]    <u>See</u> Doc. 14, Pl.'s Mot. for Summ. J. pp. 5, 11.

[144]    <u>See</u> Tr. 63.

23

finding.[145]  Rather, the ALJ asked the VE what jobs Plaintiff could perform on the day of the hearing at the light and sedentary exertional levels including semi-skilled and unskilled work.[146]  In addition to not including the above limitations, the ALJ's questioning of the VE is problematic because it pertains to Plaintiff's capabilities on the day of the hearing which was over a month after Plaintiff's alleged closed period of disability.

Based on the ALJ's questioning, the VE testified that Plaintiff would be capable of working: (1) at the light/semi-skilled level as a supply clerk, file clerk, and shipping checker; (2) at the light/unskilled level as a non-postal mail clerk, office helper, and parking lot cashier; (3) at the sedentary/semi-skilled level as an appointment clerk, data order clerk, and freight shipment clerk; and (4) at the sedentary/unskilled level as a document preparer, charge account clerk, and order clerk.[147]

In his decision, the ALJ found that Plaintiff was capable of working as a: (1) cafeteria attendant; (2) office cleaner; (3) document preparer; and (4) surveillance system monitor.[148]  Other than document preparer, these were jobs never mentioned by the VE. The VE never testified based on the RFC the ALJ used, and, even if

---

[145]    See Tr. 87-88.

[146]    See id.

[147]    See id.

[148]    See Tr. 71.

she had, the VE never testified that Plaintiff could work as a cafeteria attendant, office cleaner, or surveillance system monitor.[149]

The Fifth Circuit has held that the ALJ cannot rely on testimony elicited by a defective hypothetical question. See Boyd v. Apfel, 239 F.3d 698, 708 (5th Cir. 2001). Here, the ALJ's hypothetical question is clearly defective as it did not include any of the limitations found in the ALJ's ultimate determination of Plaintiff's RFC and pertained to Plaintiff's capabilities after his alleged period of disability. Further, even if the ALJ's hypothetical question was not defective, the ALJ erred by finding that Plaintiff was capable of performing jobs not found in the VE's testimony. The court acknowledges that document preparer was listed by the VE and appeared in the ALJ's decision. Because of the other errors in the decision, the court is unwilling to assume that this one position meets the Commissioner's burden. For these reasons, the court finds that the ALJ's decision was not supported by substantial evidence.

This case should be remanded to the ALJ so that these errors can be corrected. Due to the inadequacy of the ALJ's decision, the court cannot definitively say that the records from Plaintiff's alleged closed period of disability that were not originally considered by the ALJ would have no effect on the ALJ's decision.

---

[149]    See Tr. 87-88.

See 20 C.F.R. §§ 1470, 1483-84.  Accordingly, upon remand, Plaintiff should be allowed to submit these records for consideration.

### IV. Conclusion

Based on the foregoing, the court **RECOMMENDS** that Plaintiff's motion be **GRANTED,** Defendant's motion be **DENIED,** and this matter be **REMANDED** for further consideration in light of the court's memorandum.

The Clerk shall send copies of this Memorandum and Recommendation to the respective parties who have fourteen days from the receipt thereof to file written objections thereto pursuant to Federal Rule of Civil Procedure 72(b) and General Order 2002-13.  Failure to file written objections within the time period mentioned shall bar an aggrieved party from attacking the factual findings and legal conclusions on appeal.

The original of any written objections shall be filed with the United States District Clerk electronically.  Copies of such objections shall be mailed to opposing parties and to the chambers of the undersigned, 515 Rusk, Suite 7019, Houston, Texas 77002.

**SIGNED** in Houston, Texas, this 28th day of February, 2019.

U.S. MAGISTRATE JUDGE

26